THE CHICAGO, ROCK ISLAND & PACIFIC RAILWAY COMPANY v. ARTHUR ASSMAN.
THE CHICAGO, ROCK ISLAND & PACIFIC RAILWAY COMPANY v. CARL ASSMAN.

No. 15,524.    (96 Pac. 843.)

SYLLABUS BY THE COURT.

1. RAILROADS—*Injury at a Crossing—Contributory Negligence.* The particular acts of care and vigilance required of a traveler when about to cross a railroad track at a public crossing will depend in a large measure upon the facts connected with the particular crossing. If he exercises ordinary care and vigilance to avoid injury he will not be barred of recovery on account of contributory negligence.

2. —— *Contributory Negligence.* The facts of this case examined, and *held*, that the party injured was not guilty of contributory negligence.

Error from Marion district court; OSCAR L. MOORE, judge. Opinion filed July 3, 1908. Affirmed.

STATEMENT.

ARTHUR ASSMAN, while attempting to cross the track of the Chicago, Rock Island & Pacific Railway near Tampa with a load of coal drawn by a team of young horses owned by his brother, Carl Assman, was struck by a passing freight-train and injured, the

team being killed. The brothers each brought an action in the district court of Marion county. By agreement the cases were consolidated for the purpose of trial, and tried together. Arthur recovered $700, and Carl $315. The railway company brings the case here for review. The company demurred to the evidence, requested the court to direct a verdict in its favor, moved for judgment on the answers to the special questions, and asked for a new trial, all of which were overruled by the court, and these rulings are assigned as error.

The jury answered special questions as follow:

(*Special questions submitted by plaintiff.*)

"(1) Ques. At the time of the accident did the traveled part of the road leading east from Tampa curve toward the southeast and join the section-line road running north and south just east of Tampa, at a point some distance north of the crossing in question? Ans. Yes.

"(2) Q. If you answer No. 1 'Yes,' state how far from the railroad-crossing in question the curve commenced. A. One hundred and seven feet.

"(3) Q. If you answer question No. 1 'Yes,' state whether plaintiff, just before the accident complained of, stopped, looked and listened for a train while driving on this curve. A. Yes.

"(4) Q. If you answer the last question 'Yes,' state whether plaintiff looked and listened for a train after he started on toward the crossing. A. Yes.

"(5) Q. When the train in question passed the switch, was plaintiff looking east? A. Yes.

"(6) Q. Had the plaintiff looked to the west for the train just before he looked to the east? A. Yes.

"(7) Q. Did plaintiff exercise ordinary diligence in approaching the crossing where the accident occurred? A. Yes."

(*Special questions submitted by defendant.*)

"(1) Ques. Was it moonlight at the time the plaintiff met with the accident? Ans. Yes.

"(2) Q. Was the headlight of the engine burning at the time of the accident? A. Yes.

"(3) Q. Did the plaintiff drive the team toward the crossing at a rapid walk? A. Yes.

"(4) Q. What kind of a train was the one which struck the team—freight or passenger? A. Freight.

"(5) Q. How far was the engine of the train from the crossing when it was first seen by the plaintiff? A. About 150 feet.

"(6) Q. Was the team which was driven by the plaintiff on the crossing at the time the train was first seen by the plaintiff? A. Yes.

"(7) Q. Did the train crew in charge of the engine which struck the team sound the whistle of the engine near the whistling-post west of the station of Tampa? A. Yes.

"(8) Q. At what rate of speed was the train running as it approached the crossing? A. Fifty or sixty miles per hour.

"(9) Q. In what distance was the train stopped after the engineer saw Arthur Assman driving toward the crossing and after he applied the braking appliances on the engine? A. About one-half mile.

"(10) Q. Under the circumstances and conditions existing at the time, could the train have been stopped in this distance if it had been running more than thirty or thirty-five miles an hour as it approached the crossing? A. Yes.

"(11) Q. Was the plaintiff, Arthur Assman, looking toward the east at the time the team jumped forward? A. Yes.

"(12) Q. If you answer the preceding question in the affirmative, then state whether Arthur Assman had looked toward the west to discover the possible approach of trains prior to this time. A. Yes.

"(13) Q. If you answer the preceding question in the affirmative, then state where Arthur Assman was with reference to the distance from the crossing at the time he looked toward the west prior to the time he was looking toward the east when his team jumped forward. A. Twenty-five feet north of the crossing.

"(14) Q. Did the plaintiff, Arthur Assman, stop for the purpose of looking and listening for trains as he approached the crossing? A. Yes.

"(15) Q. If you answer the preceding question in the affirmative, then state how far the place where he stopped was from the crossing. A. Fifty feet.

"(16) Q. From the place where the plaintiff, Arthur Assman, stopped, up to the crossing, was there any-

Railway Co. v. Assman.

thing on the right of way which obstructed the view of the main track to the west? A. Yes.

"(17) Q. If you answer the preceding question in the affirmative, then state what obstructed the view of the main track to the west. A. Box cars, trees, and section-house.

"(18) Q. What is the distance from the culvert north of the crossing to the crossing? A. Nineteen feet.

"(19) Q. What is the distance from the crossing to the switch-stand or target where the house-track begins? A. Two hundred and forty-four feet.

"(20) Q. What is the distance from the switch-stand or target where the house-track begins to the point west of it where the south rail of the house-track switch leaves the space between the rails of the main track? A. Eighty-one feet.

"(21) Q. What is the distance from the point where the south rail of the house-track switch leaves the space between the rails of the main track westward to a point on the north rail of the main track opposite the east end of a box car so placed on the house-track that it will just clear the main line and allow safe operation of trains on the main line? A. About six feet.

"(22) Q. How much clearance must there be between the north rail of the main track and a car standing on the house-track to allow safe operation of trains on the main track? A. Forty-six inches.

"(23) Q. Standing in the highway twenty-seven feet from the crossing, how far can a traveler see up the track to the west, if there are box cars on the house-track which just clear the main line? A. About 340 feet.

"(24) Q. Standing in the highway twenty-one feet from the crossing, how far can a traveler see up the track to the west, if there are box cars on the house-track which just clear the main line? A. About 400 feet.

"(25) Q. Standing in the highway eighteen feet from the crossing, how far can a traveler see up the track to the west and see the engine of an approaching train, if there are box cars on the house-track which just clear the main line? A. About 450 feet.

"(26) Q. How far to the west of the crossing is the main line perfectly straight? A. About two miles.

"(27) Q. How far to the east of the crossing is the main line perfectly straight? A. About one and one-half miles."

*M. A. Low,* and *Paul E. Walker,* for plaintiff in error.
*W. H. Carpenter,* for defendants in error.

The opinion of the court was delivered by

GRAVES, J.: While the face of the record and the requests for instructions made by the railway company show that it denies the negligence imputed to it, yet in the argument this point is not seriously contested. It may therefore be assumed that the railway company was guilty of negligence by failing to sound a whistle or bell while passing through the town and when approaching the crossing where the accident in question occurred. The real controversy arises, therefore, upon the question whether or not Arthur Assman was guilty of contributory negligence which bars a recovery.

The time when the train arrived at the crossing was about 9 o'clock on a moonlight night in August. There was a mill near the crossing in operation, which would to some extent deaden the sound of an approaching train. Assman was driving a team of young horses, and hauling a load of coal. He was seated in a spring-seat, which was on the top of double sideboards. He expected a train. He was familiar with the crossing and had passed over it several times that day. His team traveled in a rapid walk. When at a curve in the road 107 feet from the crossing he stopped, looked and listened for a train; observing nothing, he proceeded, looking and listening as he went. When fifty feet from the crossing he again stopped and looked and listened for a train, and not hearing or seeing any again moved forward toward the crossing. At a point nineteen feet from the crossing there is a culvert. When within six feet of the culvert Assman looked first to the west for a train, then to the east, and when his horses reached the culvert they began to jump, and were at the crossing

when Assman first saw the train, which rushed by and inflicted the injuries of which complaint has been made. The train was running at the rate of from fifty to sixty miles an hour. It was a freight-train, about 500 feet long. Trees, section-house and box cars on the side-track obstructed the view west of the crossing. The box cars were standing on the east end of the side-track so they would just clear the main line. Two witnesses, Ed Assman and George Scheiderman, testified that they located themselves in a buggy, with the horses on the culvert, nineteen feet north of the crossing where the plaintiff's horses began to jump, when box cars were on the side-track as at the time the accident occurred, and saw, while in that situation, a train come in from the west, and it could not be seen by them until it had passed the east end of the side-track, and the main line could not be seen west of the switch. This shows that when Arthur Assman crossed the culvert, and just before his horses began to jump, no train was visible from his location.

Against these facts stand the findings of the jury founded upon measurements made after the accident. It will be seen that the points in Assman's line of travel from which the measurements were made cover only nine feet. Three points were selected: one eighteen feet, another twenty-one feet, and the last twenty-seven feet from the crossing. No estimates are given from points where it appears that he looked or anywhere else from which it is claimed that he might have seen the approaching train. These findings are not inconsistent with those which show that a train could not be seen from the several points where Assman is found to have looked and listened. It is urged, however, that had Assman looked from either of the points fixed by the measurements he must have seen the train, and could have avoided the injury, and therefore must be held to have been guilty of contributory negligence which will bar a recovery. These three points are the

only places at which it appears that a train could have been seen. They are found within a space of nine feet. It appears that Assman looked to the west just before his horses were on the culvert, which is nineteen feet from the crossing. He must have been very close to one or more of these points when he looked. The burden of proof is upon the railway company to establish the alleged contributory negligence.

It does not appear that Assman knew on the night of the injury where the points were from which an approaching train could be seen, as subsequently discovered by the engineer who made the measurements. He was generally familiar with the crossing, it is true, but the box cars on the side-track were an obstruction to the view, and it does not appear that they had been in that exact location for such a time that he would be familiar with their effect upon observations from near the crossing, as if they had been a permanent object, like a house or hedge fence. It should not be assumed, therefore, that his failure to find these points of view and his omission to look therefrom were due to indifference or negligence. It has been shown that he expected a train, and stopped, looked and listened several times. His conduct throughout was that of a cautious and careful traveler in the exercise of at least ordinary vigilance to avoid injury. The fact that he did not look after his horses began to jump was due to the necessity of managing his team. He was then within nineteen feet of the crossing, and it was important to be in control of the horses if possible. Nor should he be held to the exercise of such care in looking and listening or in the management of his team, without warning, as would be exercised by a person who was expecting a train running at such a high rate of speed. He had a right to assume that an approaching train would comply with the law by sounding the required signals at the crossing, and would run at an ordinary speed.

Railway Co. v. Assman.

The jury, upon consideration of all the circumstances, have found that Assman was in the exercise of ordinary care. This finding has been approved by the trial court. We think the finding should not be disturbed. The judgment of the district court is affirmed.

JOHNSTON, C. J., MASON, SMITH, BENSON, JJ., concurring.

PORTER, J. (dissenting) : I dissent for the reason that the findings show such contributory negligence on the part of Arthur Assman as, in my judgment, prevents recovery by either plaintiff. Besides being familiar with the crossing for fifteen years, he had driven over it several times the day of the accident, and knew all the surroundings. He stopped and looked on the curve fifty feet from the crossing, at a point where obstructions to some extent prevented him from seeing a train approaching from the southwest. He looked again in that direction at a distance of twenty-five feet. After that he kept his gaze to the southeast, where his view of the track for half a mile or more was, and had been, unobstructed, and where there was no danger of a surprise. He drove upon the crossing without looking again in the direction in which his view had been up to that time obstructed and from which the train came. The finding of the jury that he was not guilty of contributory negligence can not, in my judgment, stand against the findings showing the actual conditions.

I am authorized to say Mr. Justice Burch also dissents.